IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ADRIAN LESHAY STEVENS,      )
                                     )
        Plaintiff,          )
                                     )
v.                             )    CIVIL CASE NO. 2:23-cv-283-ECM
                                     )            [WO]
DAVID GAMS, M.D.,           )
                                     )
        Defendant.     )

**MEMORANDUM OPINION and ORDER**

**I. INTRODUCTION**

This case arises out of an alleged injury Adrian Leshay Stevens ("Stevens")—then a prisoner in the custody of the Alabama Department of Corrections ("ADOC")—sustained after a slip and fall, and concerns her subsequent medical care. Proceeding under 42 U.S.C. § 1983, Stevens sued Wexford Health Sources, Inc. ("Wexford") and nine medical personnel claiming the ten Defendants were "deliberately indifferent to [her] serious medical needs" in violation of the Eighth Amendment. (Doc. 1 at 20, para. 150; *id.* at 20–35, paras. 148–255).

Three Defendants were dismissed without prejudice for failure to effectuate service under Federal Rule of Civil Procedure 4(m). (Doc. 35). Stevens later stipulated to dismissal of all claims against six of the remaining Defendants under Federal Rule of Civil Procedure 41(a)(1)(A)(ii). (Doc. 93). At this stage, only Stevens' deliberate indifference claim

persists against the sole Defendant in this suit:  David Gams, M.D. ("Dr. Gams").[1]  As such, the Court must resolve two pending motions:  (1) Dr. Gams' motion for summary judgment (doc. 82), and (2) Stevens' motion to amend her complaint (doc. 59).  Both motions are fully briefed and ripe for review.  Based on a thorough review of the record, briefs, and applicable law, and for the following reasons, the Court finds that both motions are due to be DENIED.

## II.  JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III.  STANDARD OF REVIEW

### A.    Summary Judgment

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting FED. R. CIV. P. 56(a)).  "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted).  However,

---

[1] In the Rule 41(a)(1)(A)(ii) stipulation, the parties attempted to dismiss another claim against Dr. Gams for failure to train or supervise. (Doc. 93 at 1).  Because Rule 41(a) only permits parties to voluntarily dismiss entire actions rather than discrete claims, *see Rosell v. VMSB, LLC*, 67 F.4th 1141, 1144 (11th Cir. 2023), the Court construed that portion of the stipulation as an unopposed motion to amend the complaint under Rule 15 to withdraw that claim and granted the construed motion, (*see* doc. 97 at 1–2).

"conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non[]moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); FED. R. CIV. P. 56(c). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Celotex*, 477 U.S. at 322–23). The burden then shifts to the nonmoving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12 (citing *Celotex*, 477 U.S. at 324). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Nonmovants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant. *Fla. Int'l Univ.*, 830 F.3d at 1252. Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Id.* The Eleventh Circuit has "long recognized that 'courts routinely and properly deny summary judgment on the basis of a party's sworn testimony.'" *Sears v. Roberts*, 922 F.3d 1199, 1207 (2019) (citing *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005)). When a plaintiff testifies to specific, discrete facts, her testimony cannot be discounted at summary judgment. *Id.* (citing *Feliciano v. City of Mia. Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013)). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

**B.    Deliberate Indifference**

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. "Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment." *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007)[2] (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

To successfully pursue a deliberate indifference claim, a plaintiff must satisfy a two-part test:

---

[2] The Court, here and elsewhere, references cases that address deliberate indifference claims arising under the Fourteenth Amendment's Due Process Clause. These cases are informative because "the standards under the Fourteenth Amendment" in this context "are identical to those under the Eighth." *Goebert*, 510 F.3d at 1326 (citing *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1115 (11th Cir. 2005)).

> 1. *First*, of course, the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, "objectively, 'sufficiently serious.'"
>
> 2. *Second*, the plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law," and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat, again, that even if the defendant "actually knew of a substantial risk to inmate health or safety," he "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk."

*Wade v. McDade*, 106 F.4th 1251 (11th Cir. 2024) (en banc) (internal citations omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 839, 844–45 (1994)).  A plaintiff must also produce sufficient evidence of "causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (citing *Goebert*, 510 F.3d at 1326)).

In other words, to prevail, "a plaintiff must satisfy both an objective and a subjective inquiry." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).  To satisfy the objective inquiry in the medical context, a plaintiff must demonstrate an "objectively serious medical need," which is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," and, in either instance, "one that, if left unattended, poses a substantial risk of serious harm." *Id.*  "A serious medical need can also be determined by 'whether a delay in treatment exacerbated the medical need or caused additional complications.'" *King v.*

*Lawson*, 2024 WL 3355179, at *3 (11th Cir. July 10, 2024)[3] (citing *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019)).  Delays in treatment may form a basis for a deliberate indifference claim.  *See Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("[D]eliberate delay on the order of hours in providing care for a serious and painful [injury] is sufficient to state a constitutional claim.").  Failing to explain a delay permits an inference of deliberate indifference.  *Id.* (noting that when a defendant "ignore[s] without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference").

To satisfy the subjective inquiry, a plaintiff must show that the defendant: "(1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) engaged in conduct that amounts to subjective recklessness."  *Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024) (citing *Farmer*, 511 U.S. at 836–40).  To demonstrate subjective knowledge of a risk of serious harm, it is not enough to show that a defendant "*should have known*" of a substantial risk of serious harm—a defendant must "*actually kn[o]w* of a substantial risk of serious harm."  *See Wade*, 106 F.4th at 1257 (emphases in original). Further, the subjective recklessness element is "satisfied only if the plaintiff shows 'that the defendant actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm.'"  *Stalley*, 124 F.4th at 1283 (quoting *Wade*, 106 F.4th at 1253).  Even so, "a defendant who 'responds reasonably' to a risk, even a known risk,

---

[3] Here, and elsewhere in this Opinion, the Court cites nonbinding authority.  While the Court acknowledges that these cases are nonprecedential, the Court finds them persuasive.

'cannot be found liable'" under the Eighth Amendment. *Wade*, 106 F.4th at 1255 (quoting *Farmer*, 511 U.S. at 844).

This subjective inquiry flows from the fact that deliberate indifference claims are an offshoot of the Eighth Amendment's prohibition of cruel and unusual punishments, to "isolate those who inflict punishment," and "ensure that only inflictions of punishment carry liability." *Farmer*, 511 U.S. at 839, 841. For that reason, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. Conduct that amounts to negligence or "an inadvertent failure to provide adequate medical care" is insufficient to establish deliberate indifference. *Id.* at 105; *accord Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *see also Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020) ("It bears repeating that deliberate indifference is *not* a constitutionalized version of common-law negligence." (emphasis in original)).

## C.    Amending a Complaint

Under Federal Rule of Civil Procedure 15(a), "a party seeking to amend its complaint after . . . a responsive pleading has been filed[] may amend the complaint 'only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.'" *Smith v. Sch. Bd. of Orange Cnty.*, 487 F. 3d 1361, 1366 (11th Cir. 2007) (per curiam) (quoting FED. R. CIV. P. 15(a)). However, when a "party's motion to amend is filed *after* the deadline for such motions, as delineated in the court's scheduling order, [Federal Rule of Civil Procedure 16(b) applies, and] the party must show good cause

why leave to amend the complaint should be granted." *Id.* (emphasis added) (citing FED. R. CIV. P. 16(b)). If courts "considered only Rule 15(a) without regard to Rule 16(b)," courts "would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998) (per curiam). The "good cause" standard "precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Id.* at 1418 (quoting FED. R. CIV. P. 16 advisory committee's note to 1983 amendment). "If [a] party was not diligent, the [good cause] inquiry should end." *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1232 (11th Cir. 2008) (quoting *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)).

## IV. FACTS[4]

### A.    Background[5]

On March 23, 2021, while in ADOC's custody, Stevens slipped and fell on a wet floor in the Alabama Therapeutic Education Facility's cafeteria and broke her right kneecap.[6] (Doc. 1 at 4–5, paras. 25, 28–33; doc. 84-2 at 3; doc. 92-2 at 10).[7] Medical personnel transported her to Shelby Baptist Medical Center's ("Shelby") emergency

---

[4] The Court construes the facts in the light most favorable to Stevens, the nonmovant, and draws all justifiable inferences in her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[5] As the Court explains further below, these facts are recounted for background purposes and do not form the basis of Stevens' deliberate indifference claim.

[6] Stevens' medical records describe her injury as a "Right Patella Fracture." (Doc. 84-1 at 22).

[7] For clarity, the Court refers to the document and page numbers generated by CM/ECF.

department. (Doc. 1 at 5, para. 31; doc. 92-2 at 4).   A doctor diagnosed Stevens with a "transverse fracture of [her] right patella" which "require[d] surgery." (Doc. 92-2 at 7).   On March 24, 2021, Shelby discharged Stevens and returned her to the ADOC's custody at the Julia Tutwiler Prison for Women's ("Tutwiler") infirmary. (*See id.*; doc. 92-1 at 4; doc. 92-10 at 16–17).

On March 24, 2021, the same day Stevens arrived at Tutwiler, Dr. Gams, a board certified OBGYN licensed to practice in Alabama (doc. 84-1 at 2), "completed an urgent referral request for . . . Stevens to be seen by Thomas Powell, M.D. [("Dr. Powell")], an outside free world orthopedic surgeon . . . requesting a[n] ORIF [(Open Reduction and Internal Fixation)] of [her] right patella fracture." (Doc. 84-1 at 4; doc. 92-1 at 4). Stevens remained in the Tutwiler infirmary awaiting surgery until April 7, 2021. (Doc. 1 at 5, para. 36; doc. 84-1 at 5).

After the surgery, Stevens was instructed to wear a brace and refrain from bending her knee more than forty-five degrees. (Doc. 84-1 at 5; doc. 84-2 at 4–5).   At a follow-up x-ray appointment, Dr. Powell observed that Stevens had not complied with those instructions, as her leg was bent at about forty-five degrees in the x-ray itself and her fracture was displaced. (Doc. 84-1 at 7; doc. 84-2 at 6).   To remedy the issue, Dr. Gams completed another urgent referral for Stevens to have a revision knee surgery, requesting that she receive "a cast instead of a knee immobilizer to ensure compliance." (Doc. 84-3 at 7).

**B.     Facts Relevant to The Present Action[8]**

Stevens underwent revision surgery on May 5, 2021.  The same day, per the decision of Dr. Powell, Stevens returned to Tutwiler with a splint that was "like a hard cast" (doc. 92-10 at 18) "to remain in place until follow-up" (doc. 84-1 at 10). (*See id.* at 8–9).  Ace wrap was tied over the splints, completely obscuring the wound site. (Doc. 92-10 at 18, 35).  On May 6, 2021, Dr. Powell discontinued his order for intravenous antibiotics, which he had originally prescribed for thirty days.[9] (Doc. 92-5 at 116).[10]  The only patient-specific post-surgical instruction provided to Dr. Gams was to leave the splint in place until Stevens' scheduled follow up appointment.[11] (Doc. 84-1 at 10; doc. 84-2 at 7).

---

[8] Both parties are in agreement that Stevens' claims "rest entirely on the deliberately indifferent post-operative medical care [Dr. Gams] provided to her *after* her second surgery, which occurred on May 5, 2021. . . . [T]he medical care Ms. Stevens received at Tutwiler *before* that surgery [is] immaterial." (Doc. 91 at 4 n.2 (emphases in original); *see also* doc. 94 at 2).  Stevens also does not contend that any of Dr. Gams' actions after May 15, 2021, demonstrate deliberate indifference. (*See generally id.*; *see also* doc. 94 at 2).

[9] Stevens' expert likewise suggests that 24 hours of post-surgery antibiotics would have been adequate. (Doc. 92-8 at 8).

[10] Stevens asserts that this exhibit—displaying a number of decisions made about a single order of ceFAZolin (ancef)—demonstrates multiple orders were in place that were not discontinued. (Doc. 91 at 10–11).  However, the sheet appears to concern a single order of one medication that was issued at "9:54 CDT" on May 5, modified at "11:47 CDT" on May 5, 2021, and discontinued at "8:10 CDT" on May 6, 2021. (Doc. 92-5 at 116).  Even interpreting each of the times as referencing a separate order, each references that the medication is "On Call" and thus related to the stay at the hospital. (*Id.*).  Moreover, the medication list provided for Stevens to Dr. Gams and Tutwiler staff did not contain any mention of antibiotics (*see* doc. 94-2 at 1–7) and expressly stated, "[t]ake only the medications listed above. Contact your doctor prior to taking any medications NOT on this list." (*Id.* at 2).  Dr. Gams never received the sheet concerning the intravenous antibiotic order(s) that was discontinued by Dr. Powell before he met with Stevens on May 7. (Doc. 94-1 at 2).  Accordingly, Plaintiff has not demonstrated a genuine dispute as to this fact.

[11] The pre-printed instructions *for Stevens*, however, told her to "[o]bserve the operative area for signs of infection: redness, swelling, foul odor, drainage" and indicated that such "symptoms may become apparent after 36-48 hours." (Doc. 92-8 at 5).

At Tutwiler, Stevens was placed in the infirmary and monitored three to four times a day by medical staff. (Doc. 84-3 at 9–18). According to Stevens, she complained of pain "constantly" to her nurses, (doc. 92-10 at 36–37) and at the first opportunity "went to steady complaining[,] telling him [(Dr. Gams)] [her] leg . . . hurts." (*id.* at 36). Each day, the nurses changed Stevens' wound dressing but did not attempt to adjust her splint, or to view or clean her wound. (Doc. 84-1 at 9–18; doc. 92-10 at 19).

According to Dr. Gams' declaration testimony and Stevens' medical records, Dr. Gams saw Stevens four times, on May 7, 10, 12, and 13, 2021. (Doc. 84-1 at 10). Stevens, however, testified that Dr. Gams visited her only once during his normal rounds, which he performed on Mondays. (Doc. 92-10 at 36). Based on Stevens' testimony, this visit would have occurred on Monday, May 10, 2021—the only Monday during the relevant period.[12] Stevens testified that when Dr. Gams visited her, she continued to complain of pain in her knee and demanded her splint be removed so that the wound could be examined. (*Id.* at 37). At first, Dr. Gams stated that "he don't mess with no other doctor's work"[13] and refused to remove the splint. (*Id.* at 36). After Stevens threatened to take the splint off herself, however, Dr. Gams ordered the nurses to take off the splint and bandages and look at Stevens' knee. (*Id.* at 36–37). The nurses complied. (*Id.* at 37). Once the bandages were removed, Stevens observed that her knee was swollen with black spots, smelled rotten, and

---

[12] However, it appears that Dr. Gams recorded this visit as having occurred on May 13, 2021. (*See* doc. 84-1 at 10–11; *see also* doc. 94 at 5 (arguing that Dr. Gams did not have notice of Stevens' condition before May 13, 2021)).

[13] Quotes attributed to Dr. Gams and medical personnel come from Stevens' deposition testimony and are not disputed by record evidence.

drained cloudy fluid. (*Id.* at 37–38; doc. 92-8 at 6). One nurse remarked that she "wouldn't give a wooden nickel for that leg" because of how infected it looked. (Doc. 92-10 at 38). The nurses "ran and got [Dr.] Gams," who then observed Stevens' knee. (*Id.* at 37).

After viewing Stevens' knee, Dr. Gams called Dr. Powell to discuss Stevens' condition. (Doc. 84-1 at 9–10; doc. 84-3 at 18; doc. 92-8 at 6). Dr. Powell recommended Stevens be put on the oral antibiotic Bactrim. (Doc. 84-1 at 9–10; doc. 92-8 at 6). Dr. Gams ordered wound cultures taken from Stevens (doc. 84-1 at 11; doc. 92-9 at 19) and directed that Stevens wear an immobilizer on her knee (doc. 84-3 at 17). Nurses began attempting to clean Stevens' wound daily. (Doc. 92-10 at 38). However, despite Dr. Powell's recommendation, Stevens claims that Dr. Gams did not provide her with antibiotics after observing her knee, (*id.* at 38), though Dr. Gams points to evidence that he provided Stevens with Bactrim, (*see* doc. 84 at 12; *see also* doc. 84-1 at 9–10; doc. 92-8 at 6). Likewise, though a note in Stevens' chart indicates she was feeling better and that she was responding to Bactrim at 1:16 p.m. on May 14, (doc. 84-3 at 18), she testified that she had been given no antibiotics and that her pain continued to worsen, with her infection becoming darker looking. (Doc. 92-10 at 39). On May 14, lab results of the wound cultures came back with findings of many "gram-positive cocci in clusters and pairs," indicating a bacterial infection. (Doc. 92-8 at 6).

On the morning of May 15, 2021, a nurse noted that Stevens was not wearing her immobilizer and reminded Stevens that she had to wear it at all times. (Doc. 84-2 at 7). Between 10:00 a.m. and 2:00 p.m., the nurse observed the dressing was saturated with brownish, foul-smelling drainage, and that Stevens' knee was "much darker" and swollen.

(Doc. 84-1 at 48; doc. 92-8 at 6).  The nurse notified Dr. Gams. (Doc. 84-1 at 11).  Dr. Gams ordered labs taken and consulted with Dr. Powell, who recommended Stevens be put on the intravenous antibiotic vancomycin. (*Id.*; doc. 84-1 at 11; doc. 84-3 at 19).  Dr. Gams did not visit Stevens. (Doc. 84-1 at 10; doc. 92-10 at 36).  Labs came back indicating that Stevens' white blood cell count was, in Dr. Gams' words, "very elevated" (doc. 84-1 at 12) at 20,800 (doc. 92-8 at 6).  Despite the recommendation of Dr. Powell and continued infection, Stevens claims that Dr. Gams did not provide Stevens any antibiotics, (doc. 92-10 at 38)—though, once again, Dr. Gams' declaration testimony and medical records indicate that he prescribed an antibiotic called vancomycin to be administered every twelve hours, (doc. 84-1 at 11; doc. 84-3 at 19; doc. 92-8 at 6).

Around 3:00 p.m. on May 15, Stevens left her bed to use the restroom without her knee immobilizer on. (Doc. 84-3 at 18; doc. 92-8 at 6).  Crouching down to sit on the commode, Stevens' infected knee gave out. (Doc. 92-10 at 28).  Her knee bent forcibly backward and began to bleed. (*Id.* at 29; doc. 84-1 at 11; doc. 92-8 at 6).  Stevens' dressing was saturated with "fresh bright red blood," and three small skin tears had appeared on the back of her knee. (Doc. 84-3 at 18; doc. 92-8 at 6).  The nurses notified Dr. Gams, who ordered an x-ray to be taken of Stevens' knee. (Doc. 92-8 at 6).

Dr. Gams then ordered that Stevens be sent to Brookwood around 7:10 p.m. on May 15—days after he first observed her post-operative infection, a day after he was reportedly

given test results confirming a bacterial infection, and over nine hours[14] after he was notified that the infection had worsened from his initial observation. (Doc. 84-1 at 48, 53; doc. 92-8 at 6).

Upon her arrival to the emergency department, Dr. Kraig Johnson observed that Stevens' knee was red, hot, and "had an effusion and drainage of pus and blood." (Doc. 92-8 at 6).  X-rays revealed that there was gas in her soft tissues, a sign of severe infection or necrotizing fasciitis, and changes in the bone suggesting a bone infection. (*Id.* at 7).  Dr. Powell noted the difficulty of sterilizing the joint (doc. 84-3 at 20; doc. 92-6 at 5) and conveyed to Stevens "in great detail" (doc. 84-3 at 20) that he might have to amputate above the knee because of the severity of the infection (*id.*; doc. 92-10 at 21).  Stevens underwent two surgeries. (Doc. 84-1 at 11; doc. 92-10 at 21).

On June 4, 2021, Stevens was formally diagnosed as having had "post-surgical, hardware-associated infection of the right knee" and "septic arthritis and acute osteomyelitis of [her] right lower leg." (Doc. 92-6 at 63–64).  Stevens then underwent four additional surgeries and her knee was saved. (Doc. 84-1 at 12–13).[15]  Stevens continues to suffer from serious pain in her knee and very limited mobility. (Doc. 91 at 6).

---

[14] The nurse's notes provide a range of 10:00 a.m. to 2:00 p.m. for the actions and observations documented. (Doc. 84-1 at 48).  If the nurse notified Dr. Gams at the earliest end of this range, Dr. Gams waited nine hours and fifteen minutes to order Stevens sent to the hospital.

[15] Stevens noted she has been anesthetized thirteen times for surgeries related to her knee. (Doc. 92-10 at 21).

# V.  DISCUSSION

## A.    Summary Judgment

Dr. Gams contends that he is entitled to summary judgment on Stevens' Eighth Amendment deliberate indifference claim because Stevens fails to present sufficient evidence for a reasonable jury to conclude that Dr. Gams was subjectively aware that his own conduct, "his own actions or inactions," put Stevens "at a substantial risk of serious harm," and that he failed to respond reasonably to any such risk during the period of May 5, 2021, through May 15, 2021. *See Wade*, 106 F.4th at 1255, 1258.[16]  The Court disagrees because Stevens' deposition testimony refutes the evidence offered by Dr. Gams, genuine disputes of material fact exist that must be resolved by a jury.

According to Dr. Gams, he first learned of Stevens' infection on May 13, 2021.  He further asserts that his actions thereafter—calling Dr. Powell, prescribing Bactrim, and taking wound cultures—were medically reasonable steps for a physician to take. (*Id.* at 32–33, 36–37).  Likewise, he argues that his actions after the May 15, 2021 evaluation of Stevens' knee—calling Dr. Powell, prescribing vancomycin, and reading Stevens' lab results—were also more than reasonable. (*Id.* at 33, 36–37).  Finally, Dr. Gams argues that his actions after Stevens' incident on the commode—ordering labs and ordering a same-day transfer to Brookwood—were more than reasonable. (*Id.* at 34, 36–37).  This "above and beyond" treatment, he says, was "the opposite of refusing or denying medical

---

[16] Dr. Gams argues that his treatment manifested a reasonable response to Stevens' undeniably serious medical need. (*See* doc. 84 at 22).  However, Stevens' expert opined that Dr. Gams' response was unreasonable (doc. 92-8 at 8).

attention" and thus cannot be conduct from which a reasonable trier of fact could find that Dr. Gams was subjectively aware that his conduct put Stevens at a substantial risk of serious harm. (*Id.* at 36–37).

Stevens, however, disputes two material facts: (1) that Dr. Gams first saw her infected knee on May 13, 2021; and (2) that he provided her antibiotics. Contrary to Dr. Gams' testimony and the medical records, Stevens testified that Dr. Gams first saw her infected knee on May 10, 2021. Additionally, Stevens testified that even after he first saw her infected knee, Dr. Gams did *not* prescribe antibiotics. (Doc. 91 at 13). She thus contends that a reasonable jury, if it credited her testimony, could conclude that Dr. Gams was subjectively aware that his own conduct posed a substantial risk of serious harm. Stevens also argues that even a layperson, and thus necessarily a medical doctor like Dr. Gams, would have known that a recent surgery carries a substantial risk of serious harm in the form of a possible infection, and that his failure to evaluate or examine her wound and prescribe antibiotics even before he saw it was a disregard of that risk that manifested deliberate indifference. (*Id.* at 11, 13–15).

Stevens does not marshal sufficient record evidence to show that Dr. Gams was aware that Stevens had an infection before May 10, 2021, and thus she fails to show that he "*actually knew* of a substantial risk of serious harm" to Stevens prior to that point. *Wade*, 106 F.4th at 1262 (emphasis added) (citing *Farmer*, 511 U.S. at 844). Indeed, when Stevens returned from surgery to Tutwiler on May 5, 2021, with her wound covered by a splint and ace wrap, the only patient-specific post-surgical instruction provided to Dr. Gams was to leave the splint alone until Stevens' scheduled follow up appointment. This

meant the wound site was practically obscured from direct view or cleaning. Moreover, the active medications list for Stevens provided to Dr. Gams did not include any antibiotics, providing no indication to Dr. Gams that Dr. Powell thought Stevens' wound site presented a risk of infection necessitating antibiotics, or that Stevens had not received adequate antibiotics before leaving the hospital.[17] The record may show that a reasonable physician *should have known* of a risk of infection under these circumstances, but it is insufficient for a reasonable jury to conclude that Dr. Gams *actually knew*, before May 10, 2021, that following another physician's post-surgical instruction and failing to provide antibiotics put Stevens at a substantial risk of serious harm.

This analysis changes after the point at which Dr. Gams personally observed Stevens' infected knee—which had already manifested with swelling, black spots, a rotting smell, and cloudy drainage in an area where there had been a recent joint surgery—and received a recommendation by the surgeon who performed the surgery that Stevens receive antibiotics. Importantly, there are genuine disputes of material fact regarding when Dr. Gams first saw Stevens' infected knee and what action he took in response—in particular, whether he prescribed her antibiotics. According to Stevens, Dr. Gams first personally observed Steven's infected knee on May 10, 2021—three days earlier than Dr. Gams' testimony and the medical records indicate. Moreover, Stevens claims that after Dr. Gams personally observed her infected knee, received a recommendation from Dr. Powell and

---

[17] Stevens' expert suggests that a day of post-surgery antibiotics would have been adequate. (Doc. 92-8 at 8). By the time Stevens left the hospital, she had been given intravenous antibiotics for several hours. (Doc. 92-5 at 116).

lab results confirming the infection in her knee, Dr. Gams nonetheless did not prescribe her antibiotics, which caused her infection to worsen until she was transported to Brookwood on May 15, 2021.

If a jury credits Stevens' version of events, it could reasonably conclude that Dr. Gams was subjectively aware that his inaction—failing to give Stevens antibiotics or take other action to address her condition for several days—put Stevens at a substantial risk of serious harm and could be reasonably construed as reckless conduct.[18] *See Farmer*, 511 U.S. at 842 (explaining that whether a defendant "had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that [he] knew of a substantial risk from the very fact that the risk was obvious" (citation omitted)); *cf. Lindley v. Birmingham, City of Ala.*, 652 F. App'x 801, 806 (11th Cir. 2016) (per curiam) (concluding that the plaintiff produced sufficient evidence that a jail nurse was deliberately indifferent to his serious medical need—an infected knee—because the nurse prescribed only Tylenol in the six days after she learned of the infection, which allowed the infection to worsen).[19]  Moreover, a reasonable jury who believes Stevens' version of events could

---

[18] The Court does not suggest that every failure to prescribe antibiotics for an infection amounts to recklessness.  For example, there could be a legitimate medical reason for a doctor not to prescribe antibiotics to a specific patient, under certain circumstances, or both.  Here, however, the Court is faced with a classic factual dispute:  Dr. Gams claims he prescribed antibiotics, but Stevens claims he did not. And on this record, a jury which resolves this factual dispute in Stevens' favor could reasonably conclude that Dr. Gams was deliberately indifferent to Stevens' serious medical need.

[19] While the Court acknowledges that *Lindley* was decided pre-*Wade* and was applying a different standard, the Court nonetheless finds its analysis persuasive because, in the Court's view, the conduct at issue in *Lindley*, like the alleged conduct at issue here, amounts to subjective recklessness.

conclude that Dr. Gams did not respond reasonably after he observed Stevens' infected knee by failing to prescribe antibiotics or take other steps to treat the infection beyond ordering wound cultures and for Stevens' wound to be cleaned daily.

The same is true of the analysis after May 15. Stevens claims that five days after he originally observed the infection, Dr. Gams learned Stevens' dressing was saturated with brownish, foul-smelling drainage, indicating continued, and indeed worsening, infection. Nonetheless, under Stevens' version of the facts, Dr. Gams again opted, in the face of this worsening infection and Dr. Powell's renewed recommendation for stronger antibiotics, not to treat the infection. If a jury believes Stevens, it could reasonably conclude on this record that Dr. Gams was subjectively aware that his conduct put Stevens at a substantial risk of serious harm, and that such conduct was reckless. *Cf. id.* at 806. Additionally, a reasonable jury could conclude that Dr. Gams' decision not to prescribe antibiotics or take further action when faced with Stevens' worsening infection was not reasonable. Conversely, if a jury credits Dr. Gams' testimony and medical record evidence that show Stevens did receive the subject antibiotics, it could reasonably conclude that Dr. Gams' actions did not offend the Eighth Amendment.

Finally, following Stevens' incident in trying to sit on the commode, Dr. Gams initially responded by ordering x-rays. It was not until nine hours after he was informed the infection had worsened that he summoned an ambulance to transport Stevens to Brookwood for evaluation by an orthopedic surgeon. Dr. Gams does not identify record

evidence which would tend to explain this nine-hour delay.[20]  The lack of explanation permits an inference of deliberate indifference. *See Brown*, 894 F.2d at 1538.  Therefore, Stevens provided sufficient evidence to permit a reasonable jury to find that Dr. Gams actually knew this delay was substantially likely to result in serious harm to Stevens, recklessly disregarded that risk, and did not respond reasonably by ordering an x-ray and awaiting lab results when he was already actually aware of a persistent, worsening infection.

Dr. Gams has produced ample evidence, including his own testimony and medical records, that he prescribed Stevens antibiotics after he first learned of her infection on May 13.  But Stevens, through her own sworn testimony, claims that Dr. Gams knew about her infection earlier and disputes that he ever gave her antibiotics. These disputes constitute "a classic swearing match, which is the stuff of which jury trials are made." *Sears*, 922 F.3d at 1208 (citation omitted); *see id.* (denying summary judgment in an excessive force case where the plaintiff's sworn statements "directly contradict[ed]" the defendants' testimony and the plaintiff's medical records).  Because there are genuine disputes of material fact which a jury must resolve, Dr. Gams' motion for summary judgment is due to be denied.

---

[20] Dr. Gams' declaration testimony indicates that he decided to send Stevens to the hospital after receiving the white blood cell count lab results. (Doc. 84-1 at 12).  However, construing the facts in the light most favorable to Stevens, a reasonable jury could find this delay unreasonable.  Indeed, by May 14, Stevens had a lab-confirmed bacterial infection that was observably worse than it was five days prior, and Dr. Powell had twice recommended that Stevens be placed on antibiotics before Dr. Gams was faxed the lab results on May 15. (*Id.* at 50).

**B.    Amending the Complaint**

The remaining issue is whether Stevens may amend her complaint to add a state law medical malpractice claim.  Because the Court finds Stevens was not diligent in seeking to amend her complaint (and thus lacks good cause to amend), Stevens' motion to amend is due to be denied.

Stevens' initial complaint was filed on May 27, 2023. (Doc. 1).  Pursuant to the first Uniform Scheduling Order, entered on November 22, 2023, the deadline to amended pleadings was January 19, 2024. (Doc. 39 at 2).  After the undersigned was reassigned the case, a new Uniform Scheduling Order was entered on February 16, 2024, noting that the deadline for amending pleadings had expired and was "not extended." (Doc. 49 at 3).  The Amended Scheduling Order, entered on July 29, 2024, reiterated the same. (Doc. 56 at 2).  On December 16, 2024, Stevens filed her opposed motion to amend her complaint to add a claim of medical malpractice. (*See* doc. 59).  Because that motion was filed after the deadline for amending pleadings, Stevens must show good cause. *Smith*, 487 F. 3d at 1366; *Romero v. Drummond Co.*, Inc., 552 F.3d 1303, 1319 (11th Cir. 2008).

In explaining the delay, Stevens argues that good cause existed sufficient to satisfy Rule 16(b) "because [she] has been diligent in seeking this amendment. Plaintiff's counsel realized Friday of last week that she had neglected to include a claim of medical malpractice against the individual defendants, even though the allegations in Plaintiff's complaint support such a claim." (*Id.* at 3–4).  The assertion that counsel was neglectful— made nearly eleven months after the January 19, 2024 deadline to amend pleadings set forth in the Uniform Scheduling Order—is not sufficient to demonstrate diligence on the

part of Stevens in pursuing related claims against Dr. Gams.[21]  Further, the underlying factual bases for the new claim were known and present in the complaint when it was filed on May 27, 2023, and remained so some 569 days later, when the motion to amend was filed.

Accordingly, Stevens did not show diligence in pursuing related claims against the Dr. Gams, a prerequisite for amendment under Rule 16(b). *See Romero*, 552 F.3d at 1319 (citing *Sosa*, 133 F.3d at 1418; FED. R. CIV. P. 16 advisory committee's note).  Because Stevens was not diligent, the good cause inquiry ends. *Oravec*, 527 F.3d at 1232 (quoting *Johnson*, 975 F.2d at 609).  Therefore, Stevens' motion to amend is due to be denied.

## VI.  CONCLUSION

Medical treatment need not be "perfect, the best obtainable, or even very good," and "[a] prisoner bringing a deliberate-indifference claim has a steep hill to climb." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020).  The question at this stage is "not about which side has offered the most evidence."  *Sears*, 922 F.3d at 1207.  A factfinder may well conclude that Dr. Gams' treatment of Stevens comported with the Eighth Amendment.  But at this stage and on this record, there are genuine issues of material fact that must be resolved by a jury.

---

[21] Her counsel's actions—and inactions—are attributable to Stevens. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 397 (1993) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962)); *Link*, 370 U.S. at 633–34 (explaining that attorneys, especially in civil litigation, are "freely selected agent[s]," and allowing a plaintiff to "avoid the consequences of the acts or omissions of this freely selected agent . . . would be wholly inconsistent with our system of representative litigation"); *Young v. City of Palm Bay*, 358 F.3d 859, 864 (11th Cir. 2004) (explaining that "[in] our system of representative litigation, . . . each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts" (quoting *Pioneer Inv. Servs. Co.*, 507 U.S. at 396–97)).

For the reasons stated above, and for good cause, it is

ORDERED as follows:

1.      Dr. Gams' motion for summary judgment (doc. 82) is DENIED;

2.      Stevens' motion to amend her complaint (doc. 59) is DENIED;

3.      This case will be set for jury selection and trial by separate Order.

DONE this 29th day of September, 2025.

             /s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE